RECORD NO. 13-1523

## In The

# United States Court Of Appeals
## For The Fourth Circuit

**GAIL M. HUTTO; ELIZABETH W. HODGE; MARGARET B. LINEBERGER;
LYNN R. ROGERS; NANCY G. SULLIVAN; JANE P. TERWILLIGER; JULIAN W. WALLS;
DEBRA J. ANDREWS, and all others similarly situated,**

*Plaintiffs – Appellants,*

v.

**THE SOUTH CAROLINA RETIREMENT SYSTEM; THE POLICE OFFICERS
RETIREMENT SYSTEM; THE SOUTH CAROLINA RETIREMENT SYSTEMS GROUP TRUST;
NIKKI R. HALEY, Governor of South Carolina, in her official capacity as ex officio Chairwoman of
the South Carolina Budget and Control Board; CURTIS M. LOFTIS, JR., Treasurer of the State of
South Carolina, in his official capacity as an ex officio member of the South Carolina Budget and
Control Board; RICHARD ECKSTROM, Comptroller General of the State of South Carolina,
in his official capacity as an ex officio member of the South Carolina Budget and Control Board;
HUGH K. LEATHERMAN, Chairman of the South Carolina Senate Finance Committee,
in his official capacity as an ex officio member of the South Carolina Budget and Control Board;
W. BRIAN WHITE, Chairman of the South Carolina House of Representatives Ways and
Means Committee, in his official capacity as an ex officio member of the South Carolina Budget and
Control Board; MARCIA S. ADAMS, in her official capacity as Executive Director of the
South Carolina Budget and Control Board; DAVID K. AVANT, in his official capacity as
Executive Director of the South Carolina Public Employee Benefit Authority,**

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

———————

### BRIEF OF APPELLANTS
———————

| | |
|---|---|
| Richard A. Harpootlian | James M. Griffin |
| Graham L. Newman | Margaret N. Fox |
| Christopher P. Kenney | LEWIS, BABCOCK |
| RICHARD A. HARPOOTLIAN, PA | & GRIFFIN, LLP |
| 1410 Laurel Street | 1513 Hampton Street |
| P. O. Box 1090 | P. O. Box 11208 |
| Columbia, SC 29202 | Columbia, SC 29211 |
| (803) 252-4848 | (803) 771-8000 |
| *Counsel for Appellants* | *Counsel for Appellants* |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

who is _____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    YES    NO

2.    Does party/amicus have any parent corporations?    YES    NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    YES    NO
      If yes, identify all such owners:

- 1 -

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES     NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)        YES     NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                        YES     NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                        _____
        (signature)                                                (date)

# TABLE OF CONTENTS

**PAGE:**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES...........................................................2

STATEMENT OF THE CASE...............................................................3

STATEMENT OF THE FACTS ............................................................3

SUMMARY OF ARGUMENT ..............................................................9

STANDARD OF REVIEW .................................................................13

ARGUMENT ......................................................................................13

    I.     The Retirement Systems are independent corporate entities for which the State has no financial obligation as guarantor....................19

           A.     State law explicitly insulates the state treasury from any judgment against the Retirement Systems ................................22

           B.     The sovereign dignity Ram Ditta factors demonstrate that the General Assembly established the Retirement Systems as separate and distinct from the State ......................31

           C.     The District Court failed to require *any* evidentiary showing that the Ram Ditta factors were met...........................35

    II.    Working Retirees are entitled to prospective injunctive relief prohibiting the future seizure of their wages.......................................44

    III.    The Eleventh Amendment provides no immunity from suit for an unconstitutional taking of private property .....................................48

A.    Suits to recover property from the government have never been barred by sovereign immunity ................................. 49

B.    Because Act 153 takes property for private, not public use, it is always barred by the Fifth and Fourteenth Amendments .......................................................................... 54

CONCLUSION ....................................................................................... 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**PAGE(S):**

## CASES:

Ahrens v. State,
        709 S.E.2d 54 (S.C. 2011) ...............................................................9

Alden v. Maine,
        527 U.S. 706 (1999)...........................................................16, 20, 48

Almond v. Boyles,
        612 F. Supp. 223 (E.D.N.C. 1985), aff'd,
        792 F.2d 451 (4th Cir. 1986), cert. denied,
        479 U.S. 1091 (1987) .............................................................passim

Atascadero State Hosp. v. Scanlon,
        473 U.S. 234 (1985)..........................................................................18

Baxter v. Vigo County Sch. Corp.,
        26 F.3d 728 (7th Cir. 1994) ...........................................................36

Beardsley v. Webb,
        30 F.3d 524 (4th Cir. 1994) ...........................................................36

Bell Atlantic Maryland, Inc. v. MCI Worldcom, Inc.,
        240 F.3d 279 (4th Cir. 2001) ......................................45, 46, 47, 48

Blake v. Kline,
        612 F.2d 718 (3d Cir. 1979), cert. denied,
        447 U.S. 921 (1980)........................................................................42

Bragg v. W. Virginia Coal Ass'n,
        248 F.3d 275 (4th Cir. 2001) ...........................................46, 47, 48

Brown v. Legal Found. of Washington,
        538 U.S. 216 (2003)..........................................................53, 54, 55

Cash v. Granville Cnty. Bd. of Educ.,
        242 F.3d 219 (4th Cir. 2001) ................................................................passim

Chicago, B. & Q.R. Co. v. City of Chicago,
        166 U.S. 226 (1897).................................................................................15

Christy v. Pa. Turnpike Comm'n,
        54 F.3d 1140 (3d Cir. 1995) ................................................................36, 40

City of Beaufort v. Beaufort-Jasper Cnty. Water and Sewer Authority,
        480 S.E.2d 728 (S.C. 1997) ......................................................................29

Consol. Coal Co. v. Local 1643, United Mine Workers of Am.,
        48 F.3d 125 (4th Cir. 1995) ......................................................................38

Constantine v. Rectors & Visitors of George Mason Univ.,
        411 F.3d 474 (4th Cir. 2005) ....................................................................16

Edelman v. Jordan,
        415 U.S. 651 (1974).............................................................................17, 44

Ex parte Young,
        209 U.S. 123 (1908).........................................................................passim

Faircloth v. Lundy Packing Co.,
        91 F.3d 648 (4th Cir. 1996) ......................................................................30

Fla. Dep't of State v. Treasure Salvors, Inc.,
        458 U.S. 670 (1982).................................................................................18

Ford Motor Co. v. Dep't of Treasury,
        323 U.S. 459 (1945).................................................................................17

Gray v. Laws,
        51 F.3d 426 (4th Cir. 1995) ................................................................24, 42

Gray v. Laws,
        915 F. Supp. 747 (E.D.N.C. 1994) ......................................................41, 42

Harter v. Vernon,
    953 F. Supp. 685 (M.D.N.C. 1996), aff'd,
    101 F.3d 334 (4th Cir. 1996) and on reconsideration,
    980 F. Supp. 162 (M.D.N.C. 1997) ...............................................24, 25, 36, 41

Hawaii Housing Authority v. Midkiff,
    467 U.S. 229 (1984)......................................................................................55

Hess v. Port Auth. Trans-Hudson Corp.,
    513 U.S. 30 (1994)...................................................................20, 24, 25, 26

Hopkins v. Clemson Agr. College of S.C.,
    221 U.S. 636 (1911)................................................................................52, 53

Idaho v. Coeur d'Alene Tribe of Idaho,
    521 U.S. 261 (1997)................................................................................17, 47

ITSI TV Prods., Inc. v. Agricultural Ass'ns,
    3 F.3d 1289 (9th Cir. 1993) ...........................................................................36

Jackson v. Georgia Dep't of Transp.,
    16 F.3d 1573 (11th Cir. 1994) .......................................................................40

Keller v. Prince George's County,
    827 F.2d 952 (4th Cir. 1987) ........................................................................42

Kelo v. City of New London, Conn.,
    545 U.S. 469 (2005).................................................................................55, 56

Kostelic v. Bernardi,
    538 F. Supp. 620 (N.D. Ill. 1982)..................................................................25

Larson v. Domestic & Foreign Corp.,
    337 U.S. 682 (1949).......................................................................................50

Layman v. State,
    630 S.E.2d 265 (S.C. 2006) ....................................................................7, 8, 9

Legal Tender Cases,
    79 U.S. (1 Wall.) 457 (1870) .........................................................................15

v

Lucas v. S.C. Coastal Council,
    505 U.S. 1003 (1992) ...................................................................54

Malone v. Bowdoin,
    369 U.S. 643 (1962)......................................................................50

Martin v. Clemson Univ.,
    654 F. Supp. 2d 410 (D.S.C. 2009) ..............................................43

McMahan v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers,
    858 F. Supp. 529 (D.S.C. 1994) ...................................................15

Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Authority,
    991 F.2d 935 (1st Cir. 1993).........................................................25

Missouri Pacific R. Co. v. Nebraska,
    164 U.S. 403 (1896)......................................................................55

Monell v. New York City Dep't. of Social Servs.,
    436 U.S. 658 (1978)......................................................................17

Mt. Healthy City Bd. of Ed. v. Doyle,
    429 U.S. 274 (1977)......................................................................17

Near v. State of Minnesota ex rel. Olson,
    283 U.S. 697 (1931)......................................................................48

Patsy v. Bd. of Regents of State of Fla.,
    457 U.S. 496 (1982)......................................................................32

Penn Cent. Transp. Co. v. City of New York,
    438 U.S. 104 (1978)......................................................................15

Pennhurst State Sch. & Hosp. v. Halderman,
    465 U.S. 89 (1984)........................................................................17

Principality of Monaco v. Mississippi,
    292 U.S. 313 (1934)............................................................... 17-18

Ram Ditta By & Through Ram Ditta v.
Maryland Nat. Capital Park & Planning Comm'n,
    822 F.2d 456 (4th Cir. 1987) ................................................................passim

Regents of the Univ. of Cal. v. Doe,
    519 U.S. 425 (1997)..........................................................................24, 43, 44

Roche v. Lincoln Prop. Co.,
    175 Fed. App'x. 597 (4th Cir. 2006) ......................................................passim

S.C. Dep't of Disabilities and Special Needs v. Hoover Universal, Inc.,
    535 F.3d 300 (4th Cir. 2008) ............................................................27, 28, 33

S.C. Wildlife Fed'n v. Limehouse,
    549 F.3d 324 (4th Cir. 2008) ......................................................................13

Seminole Tribe of Fla. v. Florida,
    517 U.S. 44 (1996)..............................................................................18, 47

Skelton v. Camp,
    234 F.3d 292 (5th Cir. 2000) ......................................................................36

Smith v. McCarthy,
    349 F. App'x 851 (4th Cir. 2009)................................................................13

South Carolina v. Wesley,
    155 U.S. 542 (1895)..................................................................................51

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,
    535 U.S. 302 (2002)..................................................................................15

Takle v. Univ. of Wisconsin Hosp. & Clinics Auth.,
    402 F.3d 768 (7th Cir. 2005) ......................................................................34

Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.,
    467 U.S. 138 (1984)..................................................................................19

Tindal v. Wesley,
    167 U.S. 204 (1897)..........................................................................50, 51, 52

U.S. ex rel. Oberg v. Kentucky Higher Educ. Student Loan Corp.,
    681 F.3d 575 (4th Cir. 2012) ................................................................19, 43

United States v. Fisher,
    58 F.3d 96 (4th Cir. 1995) ................................................................ 30-31

United States v. Lee,
    106 U.S. 196 (1882)............................................................................passim

United States v. Winstar Corp.,
    518 U.S. 839 (1996)...........................................................................29, 30

Verizon Md., Inc. v. Public Serv. Comm'n of Md.,
    535 U.S. 635 (2002)..............................................................45, 46, 47, 48

Webb's Fabulous Pharmacies, Inc. v. Beckwith,
    449 U.S. 155 (1980)...................................................................................15

Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,
    466 F.3d 232 (2d Cir. 2006) ..............................................................36, 38

**STATUTES:**

26 U.S.C. § 401(a) .................................................................................passim

26 U.S.C. § 401(a)(2)................................................................................6, 28

26 U.S.C. § 401(a)(7)...................................................................................6

26 U.S.C. § 401(a)(8)...................................................................................7

26 U.S.C. § 401(a)(13)................................................................................29

26 U.S.C. § 401(a)(24)..................................................................................6

26 U.S.C. § 402..............................................................................................6

26 U.S.C. § 411..............................................................................................6

26 U.S.C. § 501(a)..........................................................................................6

28 U.S.C. § 1291 ...................................................................................................2

28 U.S.C. § 1331 ...................................................................................................1

28 U.S.C. § 2201 ...................................................................................................1

Ind. Code § 12-19-1-21 .......................................................................................36

N.C. Gen. Stat. Ann. § 135-54 ...........................................................................28

S.C. Acts 2278, Pt. I, § 4 ......................................................................................4

S.C. Code Ann. § 1-11-10 .....................................................................................5

S.C. Code Ann. § 9-1-10 .......................................................................................3

S.C. Code Ann. § 9-1-10(7) ..................................................................................7

S.C. Code Ann. § 9-1-10(9) ..................................................................................7

S.C. Code Ann. § 9-1-10(14) ................................................................................3

S.C. Code Ann. § 9-1-20 ..........................................................................3, 32, 35

S.C. Code Ann. § 9-1-1020 ..............................................................................4, 31

S.C. Code Ann. § 9-1-1050 ..............................................................................4, 31

S.C. Code Ann. § 9-1-1060 ...................................................................................4

S.C. Code Ann. § 9-1-1085 ..............................................................................4, 38

S.C. Code Ann. § 9-1-1160(A) .............................................................................4

S.C. Code Ann. § 9-1-1170 ...................................................................................4

S.C. Code Ann. § 9-1-1310 .............................................................................5, 34

S.C. Code Ann. § 9-1-1310(C) ......................................................................15, 27

S.C. Code Ann. § 9-1-1510 ................................................................7

S.C. Code Ann. § 9-1-1650 ...............................................................40

S.C. Code Ann. § 9-1-1690 .........................................................passim

S.C. Code Ann. § 9-1-1790(A) ..........................................................8

S.C. Code Ann. § 9-1-1790(C) ................................................8, 15, 45

S.C. Code Ann. § 9-4-10 ............................................................5, 34

S.C. Code Ann. § 9-11-10 ..................................................................3

S.C. Code Ann. § 9-11-20 .........................................................3, 32, 35

S.C. Code Ann. § 9-11-48 ..................................................................3

S.C. Code Ann. § 9-11-60 ..................................................................7

S.C. Code Ann. § 9-11-90(4) ...........................................................45

S.C. Code Ann. § 9-11-90(4)(c) ...................................................8, 15

S.C. Code Ann. § 9-11-110 ..............................................................40

S.C. Code Ann. § 9-11-210 ................................................................4

S.C. Code Ann. § 9-11-230 ..............................................................31

S.C. Code Ann. § 9-11-280 .........................................................passim

S.C. Code Ann. § 9-16-10(8) .............................................................5

S.C. Code Ann. § 9-16-20 .............................................................4, 28

S.C. Code Ann. § 9-16-20(C) ............................................................6

S.C. Code Ann. § 9-16-40 ................................................................34

S.C. Code Ann. § 9-16-315 ................................................................5

S.C. Code Ann. § 10-7-130 ..............................................................28

S.C. Code Ann. § 33-1-400(11) ........................................................32

S.C. Code Ann. § 33-3-102 ..............................................................32

## **CONSTITUTIONAL PROVISIONS:**

S.C. Const. art. X, § 13 ..................................................................30

S.C. Const. art. X, § 14 ..................................................................30

S.C. Const. art. X, § 15 ..................................................................30

S.C. Const. art. X, § 16 .............................................................29, 30

U.S. Const. amend. I ......................................................................17

U.S. Const. amend. II .....................................................................17

U.S. Const. amend. III ....................................................................17

U.S. Const. amend. IV ....................................................................17

U.S. Const. amend. V ..............................................................passim

U.S. Const. amend. VI ....................................................................17

U.S. Const. amend. VII ...................................................................17

U.S. Const. amend. VIII ..................................................................17

U.S. Const. amend. IX ....................................................................17

U.S. Const. amend. X .....................................................................17

U.S. Const. amend. XI ..................................................................passim

U.S. Const. amend. XIV ...............................................................passim

**REGULATIONS:**

Tres. Reg. § 1.401(a)-13 ...................................................................29

Tres. Reg. § 1.401-2 .........................................................................28

Tres. Reg. § 1.401(a)-2 .....................................................................28

**RULES:**

Fed. R. Civ. P. 12(b) ..........................................................................2

Fed. R. Civ. P. 12(b)(1) ....................................................................13

Fed. R. Civ. P. 12(b)(6) ....................................................................13

Fed. R. Civ. P. 25(d) ..........................................................................5

Fed. R. Civ. P. 59(e) ..........................................................................2

**OTHER:**

1 Records of the Federal Convention of 1787
        (M. Farrand ed. 1911)...............................................................55

1 W. Blackstone,
Commentaries on the Laws of England
        90 (1765)............................................................................ 29-30

6 Mertens Law of Fed. Income Tax'n
        § 25B:18 (West 2013).............................................................28

South Carolina Retirement Systems,
Comprehensive Annual Financial Report
    (F.Y. June 30, 2012), <u>available</u> <u>at</u>:
        http://www.retirement.sc.gov/financial (last accessed June 1, 2013) ...........39

State Retirement System Preservation and Investment Reform Act,
    Act No. 153, 2005 S.C. Acts 1697 (Act 153).......................................<u>passim</u>

## **INTRODUCTION**

Appellants are the employees of school districts and counties who earned their retirement pensions through years of financial contributions, retired, began collecting their pensions, and later returned to work as working retirees. These teachers and civil servants—none of whom are state employees—sued for the return of wages taken from them by operation of an unconstitutional state law. This law mandates that working retirees' employers deduct earned wages from their paychecks and deposit them into the pension trust to fund the cost of other people's retirement benefits. This reduces the funding obligations of future retirees and their employers. This taking benefits everyone but working retirees and the putative class of hundreds of other teachers, civil servants, police officers, and firefighters who receive *nothing* in return, including any increase in their pension benefits.

This appeal asks whether the Eleventh Amendment immunizes this unconstitutional redistribution of private property from suit. The court below held it does. Respectfully, it does not.

## **JURISDICTIONAL STATEMENT**

Appellants filed this action in the United States District Court for the District of South Carolina, Florence Division, on August 2, 2010, pursuant to 28 U.S.C. § 1331, asserting causes of action arising under the United States Constitution and 28 U.S.C. § 2201.

The District Court granted Appellees' motion to dismiss, pursuant to Rule 12(b), Fed. R. Civ. P., on September 27, 2012. On November 11, 2012, Appellants moved to alter or amend, pursuant to Rule 59(e), Fed. R. Civ. P. That motion was denied on April 4, 2013. On April 19, 2013, Appellants filed a notice of appeal to this Court.

This is an appeal from a final judgment dismissing all of Appellants' claims over which this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Whether the Retirement Systems are immune from suit as alter egos of one of the United States even though state law establishes the Retirement Systems as independent corporate entities and expressly disclaims any liability for their debts and obligations?

II.    Whether a complaint that alleges an ongoing violation of federal law and requests prospective injunctive relief restraining state officials from further violations is actionable under the Ex parte Young doctrine?

III.    Whether a citizen's rights under the Fifth and Fourteenth Amendments to be free from government seizure of private property without just compensation can be defeated by a claim of sovereign immunity?

## STATEMENT OF THE CASE

Appellants filed this case on August 2, 2010. Appellees aforementioned motion to dismiss was filed on September 14, 2010. On September 22, 2011, the District Court entered an Order instructing the parties to supplement the record. Appellees filed a supplemental motion to dismiss on October 7, 2011. On September 5, 2012, the District Court held a hearing on the motion. As stated above, the motion to dismiss was granted and Appellants' timely motion to alter or amend was denied.

## STATEMENT OF THE FACTS

The South Carolina Retirement System (SCRS) and the Police Officers Retirement System (PORS) (collectively the "Retirement Systems") are multi-employer, defined-benefit pension plans with the powers and privileges of corporations. S.C. Code Ann. §§ 9-1-10 et seq. (SCRS) & 9-11-10 et seq. (PORS) (1986 & Supp. 2013). SCRS was created by statute to provide retirement benefits and other benefits to the employees of public school districts, counties, municipalities, and the State of South Carolina. Id. §§ 9-1-10(14) & 9-1-20. Likewise, PORS is a statutorily-created retirement system created for the benefit of state and local law enforcement and firefighters. Id. §§ 9-11-20 & 9-11-48. Upon retirement, a vested beneficiary of the Retirement Systems receives a defined pension benefit calculated by multiplying the employee's years of service by her

3

average final compensation by either 1.82 (SCRS) or 2.14 (PORS) percent. J.A. at 38, 51-52, 65 & 73.

This benefit is funded through mandatory contributions by employees and their employer. S.C. Code Ann. §§ 9-1-1020, 9-1-1050, 9-11-210 & 9-11-220 (1986 & Supp. 2011), amended by Act No. 278, 2012 S.C. Acts 2278, Pt. I, § 4. Employers must deduct employee contributions from each paycheck and transfer the funds to the Retirement Systems. Id. § 9-1-1160(A) (Supp. 2013). Contribution rates are actuarially determined. See id. § 9-1-1060 (1986). Until just last year, the employee contribution rate was 6.5 percent of an employee's gross earnings. Compare J.A. at 41 & 69, with S.C. Code Ann. § 9-1-1085 (Supp. 2013) (establishing scheduled increases beginning in fiscal year 2012-2013). Employer contributions are calculated as a percentage of the employee's gross earnings and are also transmitted to the Retirement Systems. J.A. at 110-11; see also §§ 9-1-1050 & 9-1-1170 (mandating contributions). Participation in the Retirement Systems is mandatory for the employees of covered employers. J.A. at 38, 40, 65 & 68. The State is just one of over 600 participating SCRS and PORS employers.

Contributed funds are held in trust by the South Carolina Retirement Systems Group Trust (Trust). S.C. Code Ann. § 9-16-20 (Supp. 2013). The Trust holds SCRS and PORS funds, as well as the funds of three other statutorily-created

pension plans not at issue in this case.[1] Id. These five retirement plans are created and governed by the "Retirement Systems Act" codified in Title 9 of the South Carolina Code, as amended. The South Carolina Budget and Control Board (B&CB) and the South Carolina Public Employee Benefit Authority (PEBA) are co-trustees of the Retirement Systems. S.C. Code Ann. § 9-1-1310.[2] The B&CB and PEBA (collectively "Trustees") are the fiduciaries charged with administering the Trust, while another entity, the Retirement System Investment Commission (Commission) is charged with investing Trust assets.[3] Id.

The Retirement Systems were established as tax-deferred pension benefit plans authorized by the Internal Revenue Code (IRC). See 26 U.S.C. § 401(a). The Retirement System Act mandates that the Trustees "hold the assets of the

---

[1] The Trust also holds funds for the Retirement System for Judges and Solicitors, the Retirement System for Members of the General Assembly, and the National Guard Retirement System. S.C. Code Ann. § 9-16-10(8) (Supp. 2013).

[2] Until 2012, the B&CB—comprised of the Governor, State Treasurer, Comptroller General, chair of the Senate Finance Committee, and chair of the House Ways and Means Committee, all serving *ex officio*, S.C. Code Ann. § 1-11-10 (1986)—was the sole trustee. In 2012, the General Assembly adopted Act No. 278, which abolished the B&CB's Retirement Division and created the PEBA as co-trustee. The PEBA is governed by an 11-member board of non-state officers appointed by the members of the B&CB. S.C. Code Ann. § 9-4-10 (Supp. 2013). The PEBA's executive director has been substituted as a defendant in this action in place of the executive director of the B&CB Retirement Division, pursuant to Rule 25(d), Fed. R. Civ. P.

[3] The Commission's members include the State Treasurer, serving *ex officio*, five individuals appointed by the remaining B&CB members, and the executive director of the PEBA, serving *ex officio* without voting power. S.C. Code Ann. § 9-16-315 (Supp. 2013).

retirement systems in a group trust under Section 401(a)(24) of the [IRC] that meets the requirements of [Treasury] Revenue Ruling 81-100, 1981-1 C.B. 326, as amended by Revenue Ruling 2004-67." S.C. Code Ann. § 9-16-20(C) (Supp. 2013). IRC Section 401(a) authorizes the creation of pension trusts that exempt trust contributions from the calculation of a taxpayer's taxable gross income. 26 U.S.C. §§ 401(a), 402 & 501(a). By exempting trust contributions from a taxpayer's gross income calculation, the IRC defers taxation of this income until the taxpayer begins collecting her pension. Id. This allows the *corpus* of the trust to grow tax-exempt during the taxpayer's high-tax earning years at considerable benefit to the taxpayer.

This tax benefit is permitted *only if* the funds are held in a "qualified" Section 401(a) trust. This means that the trust fund must be held for the "exclusive benefit" of the employee and that "it [must be] *impossible*, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the *corpus* or income to be […] used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries." Id. § 401(a)(2) (emphasis added). A qualified trust must also observe some minimally-proscribed vesting threshold, after which an employee's pension benefit becomes non-forfeitable. Id. §§ 401(a)(7) & 411. Furthermore, the trust must provide "that forfeitures must not be applied to increase the benefits any

employee would otherwise receive under the plan." Id. § 401(a)(8). These provisions protect employee funds and ensure equal tax treatment for similarly situated taxpayers.

The SCRS and the PORS purport to be qualified Section 401(a) trust plans. An employee becomes a vested member of the SCRS or the PORS after earning five years' worth of service credit. S.C. Code Ann. §§ 9-1-1510 (SCRS) & 9-11-60 (PORS); see also J.A. at 51 & 73. Service credit is earned through regular payroll deductions deposited into the Retirement Systems. Id. §§ 9-1-10(7) & (9); J.A. at 40-41 & 69.

* * *

From 1969 until July 1, 2005, the Retirement System Act allowed vested retirees to begin collecting their pension and then return to covered employment without having to make further contributions to the Retirement Systems.[4] On July 1, 2005, the State Retirement System Preservation and Investment Reform Act, Act No. 153, 2005 S.C. Acts 1697 (Act 153), took effect. Act 153 changed the Retirement Systems by mandating that participating employers take a portion of a

---

[4] In 2001, the General Assembly enacted the Teacher and Employee Retention Incentive (TERI) Program, creating two ways whereby a retiree could return to covered employment. See Layman v. State, 630 S.E.2d 265, 267 (S.C. 2006). While there were differences in how these retirees received benefits after returning to work, neither the "old TERI participants" or the "old working retirees" were required to make any additional contributions to the SCRS or the PORS after returning to work.

7

working retiree's wages and deposit them in the Retirement Systems without compensating them for this loss. Specifically, Act 153 requires a retiree who begins collecting her pension and returns to covered employment to make contributions to the Retirement Systems "as if the member were an active contributing member[.]" S.C. Code Ann. §§ 9-1-1790(C) (Supp. 2013) (SCRS) and 9-11-90(4)(c) (Supp. 2013) (PORS).[5] The working retiree "does not accrue additional service credit in the system" for these contributions. Id. As the Retirement Systems' handbooks explain, a working retiree must "contribute a tax-deferred 6.5 percent of their gross pay into their retirement account. Working retirees will not earn additional service credit or receive interest on their account." J.A. at 60 & 77; see also J.A. 112, 156, 189-90 & 194.

Appellants and the putative class are vested beneficiaries of the SCRS and the PORS who retired; began collecting their pension; and then returned to their jobs as teachers, municipal and county employees, police officers, firemen, and state employees after Act 153 took effect on July 1, 2005 (hereinafter "Working Retirees").[6] Working Retirees sued challenging Act 153's confiscation of their

---

[5] Act 278 of 2012 further modified this scheme to now provide that after a working retiree earns $10,000, "the member's retirement allowance is suspended while the member remains employed by the participating employer." S.C. Code Ann. § 9-1-1790(A), as amended.

[6] Two earlier state-court litigations challenged the retroactive application of Act 153 on behalf of "old TERI participants" and "old working retirees." Layman, 630 S.E.2d at 267 (retroactive application to old TERI participants constituted a breach

wages for the benefit of the Retirement Systems—a seizure for which they receive nothing in return. As such, Act 153 violates Working Retirees' Fifth and Fourteenth Amendment rights to be free from the unreasonable and arbitrary government deprivation of private property without just compensation. U.S. Const. amend. V & XIV. This prohibition is made even clearer by the federal statutory protections afforded to IRC Section 401(a) pension plan trust participants whose retirement trust fund contributions may not be forfeited, or used or diverted for any purpose other than the exclusive benefit of the employee.

The District Court dismissed this case as barred by the Eleventh Amendment. This appeal followed.

## SUMMARY OF ARGUMENT

The Eleventh Amendment's sovereign immunity doctrine renders one of the United States immune from suit absent waiver or some exception. The purpose of state sovereign immunity is to protect state treasuries and ensure the independence

---

of contract) and Ahrens v. State, 709 S.E.2d 54 (S.C. 2011) (retroactive application to old working retirees not barred by equitable estopple doctrine), reh'g denied (May 26, 2011). All of the claims litigated in Layman and Ahrens were limited to named and class plaintiffs who returned to work *before* Act 153 took effect. Ahrens, 709 S.E.2d at 57 n.6 (defining the class as such). Accordingly, class membership here is mutually exclusive from class membership in Layman and Ahrens. Those cases also failed to reach the constitutional issues raised here. Layman, 630 S.E.2d at 272 (declining to reach constitutional issues) and Ahrens, 709 S.E.2d at 63 (declining to address constitutional issues where they are "founded on the presumption that a contractual right" existed that the Court held plaintiffs did not have).

of the states in our federal system. However, a non-state entity, like the Retirement Systems, is only entitled to immunity if their interest is so coexistent with the state's interest that the state is the real party in interest and the entity can be deemed the alter-ego of the state. This Circuit applies the Ram Ditta four-factor test to determine whether an entity meets this standard. The District Court incorrectly concluded that these four factors supported the conclusion that the Retirement Systems are alter-egos of the State.

In reaching this result, the District Court misconstrued the state constitutional and statutory schemes leading it to incorrectly conclude that the state treasury would be liable for a judgment in this case and that the Retirement Systems have a close legal relationship to the State. The District Court's oversight is most prominently illustrated by its conclusion that the State would be liable for any financial shortfall to the Retirement Systems even though the Retirement Systems Act expressly disclaims the State's liability for any of the Retirement Systems' debts or obligations. Likewise, the statutory scheme demonstrates that the Retirement Systems were established as independent corporate entities with the power to sue and be sued. This Circuit's precedent provides ample guidance in very similar, and one nearly identical, cases to which the District Court failed to adhere. In consideration of these and other factors, the District Court should have

10

concluded that the Retirement Systems are not alter-egos of the State and suit was not barred.

The District Court also incorrectly shifted the burden of establishing sovereign immunity away from the party making the claim and best able to produce facts justifying immunity. The District Court did not require Appellees to produce *any* evidence, nor would it allow Working Retirees to conduct discovery in order to rebut Appellees' sovereign immunity theory. In the absence of any facts, the District Court accepted Appellees' speculative reasoning and misconstrued the skeletal statutory scheme. This approach has been rejected by this Court and other district courts in this Circuit that have ruled on sovereign immunity claims at summary judgment.

The District Court also misunderstood the appropriate test under the Ex parte Young doctrine for determining whether Working Retirees stated a valid claim against the Trustees, some of whom are state officials serving *ex officio*. The Ex parte Young doctrine authorizes suit against a state official in federal court for prospective injunctive relief arising under federal law. In deciding the doctrine did not apply here, the District Court relied on an opinion of this Court which held that determining whether the doctrine applies at the pleadings stage requires a court to weigh application of the doctrine against sovereign immunity principles on a case-by-case basis. That opinion was vacated by the Supreme Court. The test the

District Court should have applied is a straightforward analysis that merely asks whether the complaint seeks prospective injunctive relief through the vindication of some federal right. This case meets that standard as Working Retirees seek the cessation of further enforcement of Act 153's takings provision.

Finally, even if this Court concludes that the Retirement Systems are alter-egos of the State and that Ex parte Young does not apply, this suit is not barred by the sovereign immunity doctrine. Our constitutional system does not immunize the sovereign from suit for constitutional injuries. In adopting the Fifth and Fourteenth Amendments, the People imposed a fundamental restraint on the sovereign prohibiting her from taking private property for public use without just compensation. This principle is well-established as far back as at least 1882 in United States v. Lee and has consistently recognized an individual's right to recover property illegally seized by the government—including a state—through a constitutional takings claim in federal court. Were this not the case, then it would mean that the entire Bill of Rights was effectively abrogated by adoption of the Eleventh Amendment. This cannot be the correct result and if the Court finds it necessary to reach this issue, Working Retirees respectfully submit, it should hold accordingly.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion to dismiss pursuant to Rule 12(b)(1) or (6), Fed. R. Civ. P. *de novo*. Smith v. McCarthy, 349 F. App'x 851, 856 (4th Cir. 2009). Federal questions concerning the application of the Eleventh Amendment are also reviewed *de novo*, Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 222 (4th Cir. 2001), including questions concerning the applicability of the Ex parte Young doctrine. S.C. Wildlife Fed'n v. Limehouse, 549 F.3d 324, 332 (4th Cir. 2008).

## ARGUMENT

When the General Assembly passed Act 153, it was attempting to solve a problem common to many defined-benefit pension plans, namely, the growth of future liabilities in excess of invested assets. Despite the availability of a number of legal remedies, such as increasing employee contribution rates, the South Carolina General Assembly elected to confiscate wages from Working Retirees who had already earned their pension benefit through years of employee contributions. It is undisputed that Working Retirees receive no benefit from and no compensation for the 6.5 percent of their gross wages taken by this scheme. Appellees conceded this point to the District Court:

> The Court:          And this contribution does not allow [Working Retirees] to receive any additional benefits, correct?

13

| | |
|---|---|
| Ms. Cundari: | Well, it's an entire statutory scheme, so there are other benefits with that system, other ordinary retirement benefits. But is there a *quid pro quo* specifically for the contribution? No. But the benefit is that, hopefully, they will receive their retirement benefit just like every other state employee. […] |
| The Court: | All the benefits that you've mentioned are benefits that they would have received as a result of their regular retirement though. |
| Ms. Cundari: | I think that's probably true. |
| The Court: | Okay. So the additional compensation is essentially going toward funding the system. |
| Ms. Cundari: | That's correct. |

J.A. at 457-58; see also J.A. at 194 ("Although you do not accrue additional service credit […] and are not entitled to a recalculation of benefits, the contributions help to fund the system […]."). In other words, Act 153 reduces the funding burden that would otherwise be borne by pre-retirement employees and their employers by confiscating Working Retirees' earned wages.

The Fifth Amendment provides that "[n]o person shall be […] deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The takings clause has always prohibited the direct government appropriation of private

14

property.[7] See Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 162-63 (1980); Legal Tender Cases, 79 U.S. (1 Wall.) 457, 551 (1870), abrogated as recognized in Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 326 n.21 (2002); McMahan v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 858 F. Supp. 529, 539 (D.S.C. 1994) (takings clause protects financial assets as well as real property). Act 153 seizes Working Retirees' earnings for the benefit of others, including the State. Working Retirees receive *nothing* in return—no service credit, no interest. S.C. Code Ann. §§ 9-1-1790(C) (SCRS) & 9-11-90(4)(c) (PORS). As such, Act 153 is an unconstitutional taking.

Working Retirees sued the Retirement Systems and Trustees seeking two types of relief. From the Retirement Systems, Working Retirees seek the return of their wrongfully-seized wages that were transferred into the Trust by operation of Act 153. J.A. at 31-33. The Retirement Systems' funds "are not funds of the State, but are instead held in trust as provided" by the Retirement Systems Act for the benefit of the employees. S.C. Code Ann. § 9-1-1310(C). Accordingly, this is essentially an *in rem* action by Working Retirees to recover disputed property presently held in trust. With respect to the Trustees, Working Retirees merely seek

---

[7] The takings clause is incorporated against the States through the due process clause of the Fourteenth Amendment. Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 141 n.3 (1978); Chicago, B. & Q.R. Co. v. City of Chicago, 166 U.S. 226, 241 (1897).

prospective relief enjoining their future enforcement of Act 153's takings provision. J.A. at 31-33.

In opposition to this suit, Appellees never disputed that Act 153 seizes Working Retirees' wages without compensation. Nor have they attempted to reconcile Act 153's takings provision with their obligation under federal law to observe the IRC's exclusive benefit rule and forfeiture prohibition. Instead, Appellees sought dismissal alleging this suit is barred by the Eleventh Amendment because the Retirement Systems are arms of the State.

\* \* \*

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend XI. The Supreme Court has construed the Amendment as imbuing states with the residual sovereign immunity not surrendered to the federal government at the founding. Alden v. Maine, 527 U.S. 706, 715 (1999) (citing The Federalist No. 39 (J. Madison)). Accordingly, the Eleventh Amendment confers a waivable sovereign immunity from suit rather than imposing a limit on federal judicial power. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 480-81 (4th Cir. 2005).

16

Of course, "[b]y its terms, the amendment applies only to 'one of the United States.'" Ram Ditta By & Through Ram Ditta v. Maryland Nat. Capital Park & Planning Comm'n, 822 F.2d 456, 457 (4th Cir. 1987). So while it has been extended to state officials acting on behalf of a state, Edelman v. Jordan, 415 U.S. 651 (1974), it does not immunize every political subdivisions that exercises some slice of state power.[8] Ram Ditta, 822 F.2d at 457. The Eleventh Amendment only bars suit when "the state is the real, substantial party in interest." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984) (quoting Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464 (1945)). Accordingly, the threshold inquiry for every non-state defendant seeking to cloak itself in sovereign immunity is whether, as a matter of law and fact, the entity is an "alter ego" or "arm" of the state. Ram Ditta, 822 F.2d at 457.

However, no sovereign in our system of ordered liberty enjoys *absolute* immunity. The Constitution expressly limits the government's power to invade the life, liberty, and property of the governed. U.S. Const. amends. I-X. In other words, "[t]he immunity is one the States enjoy save where there has been a surrender of this immunity in the plan of the convention." Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997) (quoting Principality of Monaco v.

---

[8] For example, municipalities and counties are not immune. Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274 (1977); Monell v. New York City Dep't. of Social Servs., 436 U.S. 658 (1978).

Mississippi, 292 U.S. 313, 322-323 (1934) (quoting The Federalist No. 81 (Hamilton))). Likewise, the Supreme Court has held that an *ultra vires* act of a state official divests her of state authority and renders her subject to suit for prospective injunctive relief from a continuing violation of federal law. Ex parte Young, 209 U.S. 123, 155–56 (1908).[9]

Working Retirees seek to recover property seized by operation of a state statute in violation of federal law and an injunction from the statutes' further enforcement. Therefore, a determination by this Court that this case was improperly dismissed turns on the affirmative resolution of any one of the following questions: (1) is this is an action against independent corporate entities? (2) is the relief sought for prospective injunctive relief? and (3) is the challenged conduct an *ultra vires*, unconstitutional taking? See Fla. Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 690 (1982). Working Retirees submit the answer to each of these questions is "yes."

The District Court incorrectly held that the Eleventh Amendment barred this suit because the Retirement Systems are alter-egos of the State and the claims against the Trustees were not cognizable under the Ex parte Young doctrine. These holdings, respectfully, should be reversed for the reasons set forth below. If this

---

[9] Other exceptions include waiver, Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985), and congressional abrogation pursuant to Section 5 of the Fourteenth Amendment. Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55–73 (1996).

Court agrees, it need not reach the third question presented here. Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C., 467 U.S. 138, 157 (1984) (doctrine of judicial restraint requires avoiding constitutional questions until necessary to decide them). However, even if this Court decides that Appellees are entitled to sovereign immunity, the opinion below should still be reversed because the constitutional takings claim brought by Working Retirees here cannot be barred by the Eleventh Amendment. Each of these questions is considered in turn.

**I.    The Retirement Systems are independent corporate entities for which the State has no financial obligation as guarantor.**

The Retirement Systems are not entitled to sovereign immunity because they fail to meet this Court's four-part test for an entity seeking alter-ego status. In Ram Ditta, this Court explained that the alter-ego inquiry turns on (1) whether the state treasury will be liable for satisfying a judgment against the entity, (2) how the entity is defined under state law, (3) the extent of state control over the entity, and (4) whether the entity is concerned with non-state or state matters. Ram Ditta, 822 F.2d at 457-58; Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 223 (4th Cir. 2001); see also U.S. ex rel. Oberg v. Kentucky Higher Educ. Student Loan Corp., 681 F.3d 575 (4th Cir. 2012) (applying same test to determine whether an entity is a "citizen"). Any extension of sovereign immunity to a non-state entity must comport with the "twin reasons" that motivated adoption of the Eleventh Amendment: States' fears that federal courts would compel payment of

Revolutionary War debts, resulting in financial ruin, and the desire to preserve "the integrity retained by each State in our federal system[.]" <u>Cash</u>, 242 F.3d at 223 (internal quotations omitted) (quoting <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30, 39 (1994)); <u>see also</u> <u>Alden</u>, 527 U.S. at 749. In recognition of the fact that these twin rationales alone fail to provide a "bright line of demarcation," this Court distilled the inquiry into the <u>Ram Ditta</u> four-factor test. <u>Cash</u>, 242 F.3d at 223. The state treasury-inquiry speaks to the Eleventh Amendment's pecuniary motives, while the other three factors address the sovereign dignity prong by examining the nature of the relationship between the entity and the State. <u>Id</u>. at 224. Application of the four-factor test here compels the conclusion that the Retirement Systems are not alter-egos of the State and thus are not immune from suit.

The District Court's conclusion to the contrary is incorrect for three reasons. First, the District Court should have given effect to the express, unambiguous language of the Retirement Systems Act and concluded that the Retirement Systems are independent corporate entities for which the State has no financial obligation as indemnitor. Instead, the District Court ignored statutes dispositive to the sovereign immunity analysis and adopted a strained misconstruction of the state constitutional and statutory scheme. The District Court also declined to consider the import of federal tax law altogether even though the Retirement Systems Act expressly states its intention to create a group trust that comports with

IRC Section 401(a). As a result of these and other oversights, the District Court erred in concluding that the statutory scheme satisfied the Ram Ditta factors in favor of immunity.

Second, these errors are heightened by the District Court's refusal to apply this Court's precedent in Almond v. Boyles, 612 F. Supp. 223 (E.D.N.C. 1985), aff'd, 792 F.2d 451 (4th Cir. 1986), and Roche v. Lincoln Prop. Co., 175 Fed. App'x. 597 (4th Cir. 2006). In Almond, this Court rejected a sovereign immunity claim by a statutorily-created retirement system nearly identical to those at issue here. Similarly, Roche held that a statutorily-created independent investment board charged with managing trust funds was not immune. In analyzing the Retirement Systems scheme, the court below should have but failed to give these precedents sufficient weight.

Third, the District Court failed to properly allocate the burden of establishing immunity on Appellees and instead credited speculation as fact by assuming that a judgment in this case would result in a call on the state treasury. J.A. at 572-74. Crediting this theory, in the absence of a preponderance of, or *any*, evidence was error.

The District Court's failure to properly apply the state treasury prong of the four-factor test is considered in Subsection A, while its failure to properly apply the sovereign dignity factors are considered in Subsection B with discussion of the

District Court's failure to adhere to precedent explained as appropriate throughout. The District Court's failure to properly allocate the burden of proof is considered in Subsection C. Respectfully, reversal is warranted based solely upon review of the statutory scheme. However, if this Court decides that the statutory scheme is inconclusive, then the District Court's failure to properly apply the burden of proof constitutes alternative grounds for reversal.

### A. State law explicitly insulates the state treasury from any judgment against the Retirement Systems.

The treasury prong of the <u>Ram Ditta</u> analysis should be conclusively decided against extending sovereign immunity to the Retirement Systems because the Retirement Systems Act insulates the state treasury from any judgment entered in this case. The District Court concluded otherwise, reasoning that the treasury prong supported a finding that the Retirement Systems are alter-egos of the State because *if* a judgment exhausted the Trust fund then the State *might* have to appropriate funds to return the Retirement Systems to solvency. J.A. at 572-74. Setting aside its speculative nature, <u>see</u> § I., subsec. C, <u>infra</u>, this reasoning demonstrates that the District Court overlooked the clear, unambiguous language of the Retirement Systems Act and instead adopted a strained construction of the state constitutional and statutory scheme.

Specifically, the District Court failed to consider two provisions in the Retirement System Act—South Carolina Code Sections 9-1-1690 (SCRS) & 9-11-

280 (PORS)—that explicitly "wall off" the state treasury from any liability

incurred by the Retirement Systems.[10] These statutes provide that

> All agreements or contracts with members of the System pursuant to any of the provisions of this chapter shall be deemed *solely* obligations of the Retirement System and the full faith and credit of this State and of its departments, institutions and political subdivisions and of any other employer *is not, and shall not be, pledged or obligated beyond the amounts which may hereafter annually be appropriated by such employers* in the annual appropriations act, county appropriations acts and other periodic appropriations for the purposes of this chapter. In case of termination of the System, or in the event of discontinuance of contributions thereunder, the rights of all members of the System to benefits accrues to the date of such termination or discontinuance of contributions, to the extent then funded, are nonforfeitable.

S.C. Code Ann. §§ 9-1-1690 & 9-11-280 (1986) (emphasis added). These sections

unequivocally disclaim any and all liability by the State for retirement system

debts beyond the State's commitment to make employer contributions as one of

over 600 non-state employers who contribute to the Retirement Systems.

In a nearly identical case, this Court affirmed a district court's conclusion

that suit against the North Carolina Teachers' and State Employees' Retirement

System was not barred by the Eleventh Amendment. Almond v. Boyles, 792 F.2d

451, 456 (4th Cir. 1986) (affirming the district court's sovereign immunity

analysis), cert. denied, 479 U.S. 1091 (1987). In Almond, plaintiffs claimed that

---

[10] Working Retirees directed the District Court to these provisions in their supporting memoranda and at oral argument. J.A. at 449 & 482-83; Mem. Opp. Mot. Dismiss, 21-22, D. Ct. Dkt. No. 16.

the retirement system violated their constitutional and statutory rights by unlawfully deducting the "employer" contributions to the retirement system and refusing to return it when plaintiffs withdrew from the system. Almond, 612 F. Supp. 223, 225 (E.D.N.C. 1985). The district court noted that even though there was no express disclaimer of the state's liability in the statutory scheme, the retirement system had still failed to demonstrate that a judgment would be paid from the state treasury and thus was not entitled to alter-ego status. Id. at 227-28 ("the State of North Carolina has not expressly immunized itself from the Retirement System's general or specific liabilities"). Here, Sections 9-1-1690 and 9-11-280 of the South Carolina Code provide precisely the sort of express immunization that the Almond Court looked for when determining whether the state was liable for a judgment against the North Carolina retirement system. The District Court should have given these Sections their intended effect and concluded that a judgment here would have no effect on the state treasury.

This Court has treated the state treasury analysis as virtually dispositive to the sovereign immunity analysis and should do so here as well. Cash, 242 F.3d at 223 (citing Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430 (1997) & Hess, 513 U.S. at 49 ("state treasury factor is the most important factor" and generally accorded dispositive weight)); Gray v. Laws, 51 F.3d 426, 434 (4th Cir. 1995) (same); Ram Ditta, 822 F.2d at 457 (same). In Harter v. Vernon, 101 F.3d 334 (4th

Cir. 1996), this Court considered whether a district court erred by failing to properly weigh the sovereign dignity factors after it concluded a sheriff lacked immunity because a judgment against him would not impact the state treasury. Id. at 337. This Court noted that its precedent of affording this factor almost dispositive weight was consistent with the Supreme Court's decision in Hess v. Port Authority Trans-Hudson Corp. because the effect on the state treasury is "the most salient factor in Eleventh Amendment decisions" and reasoned it should be afforded equally dispositive weight when, as in this case, the state will not pay the judgment. Harter, 101 F.3d at 339 (quoting Hess, 513 U.S. at 48).

In Hess, the Supreme Court considered whether a port authority created by multi-state compact was an arm of the state. In concluding it was not, the Court reasoned:

> If the expenditures of the enterprise exceed the receipts, is the state in fact obligated to bear and pay the difference? When the answer is "No"-both legally and practically, then the Eleventh Amendment's core concern is not implicated.

Hess, 513 U.S. at 51; see also Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Authority, 991 F.2d 935, 942–943 (1st Cir. 1993) ("First, and most fundamentally, [the entity's] inability to tap the Commonwealth treasury or pledge the Commonwealth's credit leaves it unable to exercise the power of the purse [and] ill-deserving of Eleventh Amendment protection."); Kostelic v. Bernardi, 538 F. Supp. 620, 622 (N.D. Ill. 1982) (suit against state agency for unemployment

25

benefits not barred where benefits are payable from a trust comprised solely of money from employers).

Sections 9-1-1690 and 9-11-280 answer the question posed by <u>Hess</u> with a definitive "no." All legal obligations of the SCRS and the PORS are "solely obligations of the Retirement System and the full faith and credit of this State […] shall not be, pledged or obligated[.]" S.C. Code Ann. §§ 9-1-1690 & 9-11-280. In <u>Hess</u>, the Court's decision was necessary to resolve a circuit split that persisted "only because the Second and Third Circuits diverge in answering the question: Are the Port Authority's debts those of its parent States?" <u>Hess</u>, 513 U.S. at 51. Here, there is no room for debate—the debts of the SCRS and the PORS are not the debts of the State. Even assuming, for the sake of argument, that a judgment exceeded the Trust assets, the State has no obligation to pay the difference. <u>See</u> <u>Roche</u>, 175 Fed. Appx. at 601 (judgment assessed against investment board trust, and not the state, had no effect on state treasury).

Not only is the state treasury protected from a possible judgment, but none of the monies held in the Trust are state funds. Approximately one-third of the Trust fund is comprised of monies deducted from employee paychecks. The other two-thirds of the Trust fund consist of employer contributions. The State is just one of over 600 participating employers. The overwhelming number of participating employers—such as counties, municipalities, school districts, and other non-state

entities—are not making contributions with state funds. <u>Cf.</u> <u>Almond</u>, 612 F. Supp. at 228 (noting "a substantial portion of the money held by the Retirement System was not appropriated by the [North Carolina] General Assembly" because non-state employers also made contributions).

The State's own employer contributions are also *not* state funds once they are deposited in the Trust. The Retirement Systems Act explicitly states that "[t]he funds and assets of the various state retirement systems *are not funds of the State*, but are instead held in trust as provided in [the Act's trust provisions]." S.C. Code Ann. § 9-1-1310(C) (Supp. 2013) (emphasis added). In <u>Almond</u>, this Court affirmed the district court's conclusion that funds held in a nearly identical statutorily-created retirement system trust were no longer state funds. The <u>Almond</u> Court explained that state funds appropriated to the retirement system "lose their identity" as such once deposited in trust. <u>Almond</u>, 612 F. Supp. at 228.

By comparison, in <u>S.C. Dep't of Disabilities and Special Needs v. Hoover Universal, Inc.</u>, 535 F.3d 300 (4th Cir. 2008), this Court concluded that the B&CB Insurance Reserve Fund (IRF) is an alter-ego of the State, and not a "citizen," for the purpose of diversity jurisdiction. <u>Id</u>. at 308. In reaching that result, this Court explained that the IRF *was* comprised of state funds because the IRF was funded through premium payments by state agencies to the IRF "for the purpose of paying all losses for which [the State] is liable and the expenses necessary to the proper

conduct of such insurance of public property[.]" Id. at 305 (quoting S.C. Code Ann. § 10-7-130) (quotations omitted). This Court also found highly probative the fact that "the [IRF] is not an entity, but rather an account that holds funds designated to pay losses under insurance issued by the [B&CB]." Id. By comparison to Almond and Hoover, Almond is clearly the more analogous precedent and should control the outcome here.

While the Almond Court did not elaborate further, its conclusion was likely motivated, at least in part, by the fact that the North Carolina retirement system, like the Retirement Systems here, is an IRC Section 401(a) pension plan. Compare N.C. Gen. Stat. Ann. § 135-54 (West 2013) (funds must be held in qualified trust under IRC § 401(a)) with S.C. Code Ann. §§ 9-16-20 (same). Section 401(a) limits trust assets to those held for the "exclusive benefit" of participating employees. 26 U.S.C. § 401(a)(2). This means it must be

> impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the *corpus* or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries […].

Id.; see also Tres. Reg. §§ 1.401-2, 1.401(a)-2. Section 401(a)(2)'s impossibility requirement "means the trust document must definitely and affirmatively make it impossible for a nonexempt diversion or use to occur by any means whatsoever." 6 Mertens Law of Fed. Income Tax'n § 25B:18 (West 2013). This is further

28

reinforced by a prohibition against alienation or assignment of an employee's beneficial interest. 26 U.S.C. § 401(a)(13); Tres. Reg. § 1.401(a)-13. Accordingly, as a Section 401(a) trust plan, all contributions to the Retirement Systems, by operation of state and federal law, lose their character as "state" funds upon deposit into the Trust. Concluding otherwise frustrates the federal tax scheme which is predicated on the theory that tax-deferred treatment is permissible so long as it provides an incentive to the taxpayer (and her employer) to fund her pension plan.

The District Court's conclusion that the State is liable for the obligations and debts of the Retirement Systems turns in large part on a misconstruction of a state constitutional provision that merely compels the State to comply with its funding obligations as an employer. Specifically, the court below relied heavily on its conclusion that the State is liable for any shortfall to the Retirement Systems "in accordance with [the State's] constitutional duty to ensure the availability of funds in the system to meet liabilities." J.A. at 573-74 (citing S.C. Const. Art. X, § 16). This conclusion misapprehends the purpose of Article X, Section 16 of the state Constitution.

As a general rule, one legislative body cannot bind its successor in the exercise of their legislative functions. United States v. Winstar Corp., 518 U.S. 839, 873 (1996); City of Beaufort v. Beaufort-Jasper Cnty. Water and Sewer Authority, 480 S.E.2d 728, 731-32 (S.C. 1997) (detailing cases); 1 W. Blackstone,

Commentaries on the Laws of England 90 (1765). Thus the General Assembly that adopted the Retirement Systems Act was unable to oblige successor General Assemblies to appropriate the State's employer contributions without infringing on those bodies' legislative discretion. However, the People can do by constitutional amendment what could not otherwise be done through legislative act. See Winstar Corp., 518 U.S. at 873. Accordingly, Article X, Section 16 imposes a constitutional restraint prohibiting the General Assembly from reneging on its obligation to make employer contributions. This reading is bolstered by an examination of other public finance provisions contained in Article X. For example, Article X, Section 13 authorizes bonded indebtedness that exceeds the term of a single General Assembly and mandates that successor bodies appropriate funds to pay the debt. See also S.C. Const. art. X, §§ 14 (bonded indebtedness of political subdivisions) & 15 (and school boards).

The District Court mistakenly read Article X, Section 16 in conflict with S.C. Code Sections 9-1-1690 and 9-11-280. A federal court will only construe a statute when the statute is ambiguous and cannot be given its plain meaning. Faircloth v. Lundy Packing Co., 91 F.3d 648, 654 (4th Cir. 1996). "When interpreting a statute, rules of statutory construction require that [a court] give meaning to all statutory provisions and seek an interpretation that permits [the court] to read them with consistency. United States v. Fisher, 58 F.3d 96, 99 (4th

Cir. 1995). Here, the District Court unnecessarily construed the state Constitution in a manner that rendered it irreconcilable with Sections 9-1-1690 and 9-11-280. A more natural reading of these provisions merely compels the State to fulfill its obligation to make employer contributions. While the General Assembly was able to impose this requirement on all other participating employers by legislative act, see S.C. Code Ann. §§ 9-1-1020, 9-1-1050 & 9-11-230, constitutional amendment was the only means by which it could impose the same employer-contribution rules on the State.

   **B.    The sovereign dignity <u>Ram Ditta</u> factors demonstrate that the General Assembly established the Retirement Systems as separate and distinct from the State.**

The remaining three <u>Ram Ditta</u> factors are applied to discern the nature of the relationship between an entity and a state. This Court considers how the entity is defined under state law, its degree of autonomy, and whether the entity is concerned with non-state or state matters. <u>Ram Ditta</u>, 822 F.2d at 457-58. When these factors fail to reflect the state as the real party in interest then subjecting the entity to suit does not offend the dignity of the state. <u>See Cash</u>, 242 F.3d at 224. Here, each of these factors supports the conclusion that Retirement Systems are independent corporate entities distinct from the State.

The state law and autonomy factors both weigh against extending immunity. State law creates the Retirement Systems as independent entities with the "powers

and privileges of a corporation." S.C. Code Ann. §§ 9-1-20 (SCRS) and 9-11-20 (PORS). Corporate powers are the "same powers as an individual to do all things necessary or convenient to carry out its business and affairs," including the power to sue and be sued, acquire and sell real estate, enter into contracts, borrow money, and pay and establish pension trusts. Id. § 33-3-102. All SCRS and PORS business must be conducted in these entity's own names, including the investment of funds and the holding assets. Id. §§ 9-1-20 & 9-11-20. The Trust is likewise an independent entity, whose sole purpose is to hold the assets of the five retirement systems, including the SCRS and the PORS, for the benefit of the participants. See S.C. Code Ann. § 33-1-400(11) (defining a "trust" as an "entity"). These provisions, combined with Sections 9-1-1690 and 9-11-280's disclaimer of any Retirement System obligation or debt from being imputed to the State, see § I, subsec. A, supra, conclusively establishes the General Assembly's decision to create the Retirement Systems as separate legal entities from the State.

In attempting to distinguish this fact, the District Court relied on a dissent suggesting that the creation of a corporation with the power to sue and be sued was not conclusive to decide whether sovereign immunity was waived. J.A. at 577-78 (citing Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 522 (1982) (Powell, J., dissenting). This view is contrary to this Circuit's precedent which the District Court was obliged to apply. In Roche v. Lincoln Property Co., this Court found the

32

independent corporate status of the statutorily-created investment board to be dispositive of these factors. Roche, 175 F. App'x at 601. Specifically, this Court cited the board's capacity to sue and be sued in its own name, manage its assets, pay its liabilities, promulgate rules and regulations, and formulate investment policies as *determinative* with respect to the state law and autonomy factors that the board was *not* the alter-ego of the State. Id. Similarly, in Ram Ditta, this Court also found that the entity was autonomous from the state because it was a "body corporate," that could sue and be sued, and enter into contracts and leases and buy and sell real property. Ram Ditta, 822 F.2d at 458. Conversely, this Court's decision in Hoover demonstrates what an entity looks like when the state law and autonomy factors weigh in favor of immunity. This Court noted that the IRF was "not an entity of any kind under South Carolina law." Hoover, 535 F.3d at 306. While the IRF was managed by an office within the B&CB bearing its name, the Court explained that "under state law, it is nonetheless the Board itself that is statutorily authorized to offer insurance and maintain insurance reserve funds." Id. (citing code sections). Since the Retirement Systems are expressly created as independent corporate entities, have the same attributes as the independent board in Roche, and are nearly identical to the retirement system in Almond, the state law and autonomy factors both weigh heavily against alter-ego status.

The opinion below placed great weight on the fact that the B&CB, as Trustee, is comprised of elected officials sitting *ex officio*. J.A. at 575-76. However, the District Court failed to consider that when these individuals act in their capacity as Trustee, they do so as fiduciaries acting "solely in the interest of the retirement systems, participants, and beneficiaries." S.C. Code Ann. § 9-16-40 (Supp. 2013). Furthermore, to the extent this Court looks to the identity of the individuals serving on the Trustee boards, it should only bolster the conclusion that the General Assembly intended for the Trustees to act independent of the State. As of 2012, the B&CB and PEBA serve as co-trustees. Id. § 9-1-1310; see also n.2, supra. Unlike the B&CB, none of the PEBA's 11 appointed board members are state officeholders serving *ex officio*. Id. § 9-4-10. Four members are "representative" members, meaning they belong to one of the retirement systems, including the SCRS and the PORS, as an active or retired employees. Id. Accordingly, the PEBA's membership reaffirms the General Assembly's decision to require the autonomous management of Retirement Systems from that of the State. Moreover, "the power to appoint is not the power to control[, e]specially when that power is diffused among different public officials who may hold quite different views of how the entity should conduct itself." Takle v. Univ. of Wisconsin Hosp. & Clinics Auth., 402 F.3d 768, 770-71 (7th Cir. 2005) (citations omitted).

34

Finally, the Retirement Systems have primarily non-state concerns as they serve no distinctly sovereign function. The purpose of the Retirement Systems is to provide retirement benefits to private individuals, some of whom work for the State. Id. §§ 9-1-20 & 9-11-20. Under similar circumstances, this Court found this factor "in equipoise" where "[a]lthough [the state investment board] manages money for various state agencies and thus can be fairly described as having statewide concerns, it is also true that it has many local concerns, as evidenced by its management of municipal property funds and various retirement funds on behalf of individual employees of local governments." Roche, 175 Fed. App'x. at 601. Accordingly, the balance of the sovereign dignity factors support the conclusion that the relationship between the State and the Retirement Systems is such that the State is not the real party in interest or the Retirement Systems its alter egos.

## C. The District Court failed to require *any* evidentiary showing that the Ram Ditta factors were met.

While the Court need not reach this issue in order to conclude that the Retirement Systems are not alter-egos of the State, if this Court decides that the statutory scheme is inconclusive, it should, respectfully, reverse because of the District Court's misapplication of the burden of proof. An entity invoking Eleventh Amendment immunity bears the burden of producing facts sufficient to prove by a

preponderance of the evidence that it qualifies as an alter ego of the state.[11] Harter v. Vernon, 953 F. Supp. 685, 699 n.2 (M.D.N.C. 1996), aff'd, 101 F.3d 334 (4th Cir. 1996) and on reconsideration, 980 F. Supp. 162 (M.D.N.C. 1997); see also Beardsley v. Webb, 30 F.3d 524, 531-32 (4th Cir. 1994) (rejecting sovereign immunity where defendant "failed to prove" state funds were involved). While the District Court stated that Appellees had the burden of proving they were entitled to sovereign immunity, J.A. at 564, it nevertheless ignored the standard it purported to adopt. The significance of this error is most acute with respect to the lower court's disposition of the treasury prong of the Ram Ditta analysis.

In support of dismissal, Appellees argued that "[a] money judgment against [the Retirement Systems] *could* operate against the state *if* it exceeded the amount of money available in the retirement system trust fund." Mem. Supp. Mot. Dismiss, 17-18, D. Ct. Dkt. No. 11-1 (emphasis added). This single, unsupported sentence constitutes the entire reasoning advanced by Appellees in support of their contention that a judgment against the Retirement Systems would operate against

---

[11] This Court's sister circuits have unanimously adopted this allocation of the burden. Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 237 (2d Cir. 2006); Skelton v. Camp, 234 F.3d 292, 297 (5th Cir. 2000); Christy v. Pa. Turnpike Comm'n, 54 F.3d 1140, 1144 (3d Cir. 1995); see also Baxter v. Vigo County Sch. Corp., 26 F.3d 728, 734 n.5 (7th Cir. 1994) (opining that were the court to reach the issue, "we would have to conclude that the [state entity] has not begun to meet its burden of persuasion"), superseded in other part by Ind. Code § 12-19-1-21; ITSI TV Prods., Inc. v. Agricultural Ass'ns, 3 F.3d 1289, 1292 (9th Cir. 1993) (public entity ought to bear the burden of proving facts that establish immunity).

the state treasury. In response, the District Court issued an order, stating, in relevant part, that

> The court is without sufficient factual information to make a thorough determination of whether Defendants [PORS] and [SCRS] are arms of the state. Specifically, while the parties dispute the implications of the various state statutes which govern the administration of the pension funds, neither party has provided the court with any factual basis upon which it may evaluate how the pension funds actually operate and how the pension fund operations effect or interact with the general funds of the state treasury.

J.A. at 12. The order, correctly, authorized supplemental briefing to address these concerns. In their supplemental motion, Appellees repeated the same argument the District Court found insufficient. J.A. at 434-36 (asserting that a judgment "will" operate against the State but then speculating that "an adverse judgment in this case has the potential to do significant damage to the State"). After initially recognizing these assertions as lacking, the District Court reversed its earlier view and decided in favor of immunity. Echoing Appellees' speculative reasoning, the District Court concluded:

> Here, a judgment against the Retirement Systems has the *potential* to impact the State treasury. *In the event that* an award of a monetary judgment would create a shortfall in the Retirement Systems' funds, the State *may* have to make up the difference in accordance with its constitutional duty to ensure the availability of funds in the system to meet liabilities. It is *possible* that the State would account for any deficit by making additional appropriations to the Retirement Systems, in which case the State treasury would be directly impacted. Alternatively, the General Assembly *could* require members to increase their contributions to the system to make up any shortfall. In this instance, the State of South Carolina, as an employer would have

37

to increase its annual appropriation. Here again, a monetary judgment
could impact the treasury.

J.A. at 574 (emphasis added and footnote omitted).[12] This conclusion rests on
unsupported assumptions.

First, the District Court assumes that if Working Retirees prevail, there will
be a shortfall in the Retirement Systems. J.A. at 572-74. There was no evidence
before the District Court to support this conclusion. Appellees could have
supported such a conclusion by producing documents detailing the Trusts' present
assets and liabilities and showing that removing Working Retirees' seized wages
would result in a deficit. They did not. Instead, the District Court declined to allow
any discovery, J.A. at 572 n.9, or compel Appellees to produce facts as the party
with access to those facts. See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of
Educ., 466 F.3d 232, 237 (2d Cir. 2006) (noting this to be the generally-accepted
burden allocation in sovereign immunity cases). Nevertheless, the District Court
concluded that a judgment could result in a Trust deficit. Since this conclusion
lacks any evidentiary support it is clearly erroneous. See Consol. Coal Co. v. Local
1643, United Mine Workers of Am., 48 F.3d 125, 128 (4th Cir. 1995).

---

[12] During the pendency of this case, the General Assembly *did* increase employee
contributions raising them from 6.5 to 7 percent beginning in fiscal year 2012-
2013. Act No. 278, 2012 S.C. Acts 2278, codified at S.C. Code Ann. § 9-1-1085.
As presently enacted, Working Retirees are scheduled to suffer increasingly larger
seizures of their wages from 7 percent this year to 7.5 in fiscal year 2013-2014, to
8 percent in fiscal year 2014-2015 and after.

Second, consideration of the relief sought here compels the conclusion that a judgment would *not* exhaust the Trust funds. As mentioned, Working Retirees only seek the return of their own funds—the illegal contributions deducted from their wages since July 1, 2005. They do not seek removal of the employers' contributions. Nor do they seek compensatory monetary damages or attorney's fees. J.A. at 577 n.11. During this same period, non-retired employees (and employers) have also been making Trust contributions that will fund their future pension benefits. Returning Working Retirees' garnished wages will not invade the funds contributed by non-retired employees, but would merely remove funds that never should have been deposited in the first instance.

Appellees argued below that remedying Act 153's taking provision would render the Retirement Systems insolvent. J.A. at 434-36. This argument is flawed for two reasons. The SCRS and the PORS presently hold $25.6 and $3.7 billion, respectively, in assets.[13] Working Retirees' seized earnings represent a fraction of these assets contributed by a discrete class over a finite period. If returning Working Retirees' funds were to cause a deficit or even a disruption in benefits, then the Retirement Systems' own actuarially-certified annual statements would

---

[13] South Carolina Retirement Systems, Comprehensive Annual Financial Report, at 94-95 (F.Y. June 30, 2012), underline available at: http://www.retirement.sc.gov/financial (last accessed June 1, 2013); see also Mem. Opp. Mot. Dismiss, 16, D. Ct. Dkt. No. 16 (citing 2010 report for the proposition that the Retirement Systems held $23 billion in assets).

have to be grossly overstated. Regardless, even *assuming* a disruption in benefits, the State has no obligation to provide a bailout, S.C. Code Ann. §§ 9-1-1690 & 9-11-280, and "[a]lthough the [State] might well choose to appropriate money […] such voluntary payments by a state simply do not trigger Eleventh Amendment immunity." Christy v. Pennsylvania Tpk. Comm'n, 54 F.3d 1140, 1147 (3d Cir. 1995) (internal quotations omitted); Jackson v. Georgia Dep't of Transp., 16 F.3d 1573, 1577 (11th Cir. 1994) (same).

Furthermore, the Retirement Systems already have mechanisms for removing funds paid into the Trust that will not fund future pension benefits for the contributing employee. For example, a member who leaves covered employment prior to retirement can demand payment of "the sum of the member's contributions and the accumulated regular interest on the contributions." S.C. Code Ann. § 9-1-1650 (Supp. 2013); see also J.A. at 49-50, 71-72. Similarly, "[i]f a member dies before retirement, the amount of the member's accumulated contributions must be paid to the member's estate or [beneficiary]." Id. §§ 9-1-1650 (SCRS) & 9-11-110 (PORS); see also J.A. at 44-45, 77-78. These provisions—returning to an employee monies she paid in—do not imperial the Retirement Systems because the employee's withdrawal also reduces the actuarial reserves necessary to pay future benefits. So while Appellees threaten that this suit will break the Retirement

Systems, the Retirement Systems Act already codifies refund procedures with no resulting calamity.

Appellees' conclusory reasoning, adopted by the District Court, has never sufficed to establish that a judgment would operate against a state treasury. For example, Almond was decided at summary judgment where the district court was able to offer specific reasons why monetary relief did not infringe on the state treasury. Almond, 612 F. Supp. at 227-28 (explaining "the defendants have not *shown* the court that the relief requested by the plaintiffs would *inevitably* lead to an additional appropriation of state funds.") (emphasis added); see also Harter, 953 F. Supp. at 691 (defendant's failure to demonstrate how a judgment could come from the state treasury was "largely, if not wholly, dispositive."). This Court approved the same approach and reasoning in Roche where it rejected alter-ego status and concluded the investment board was a "citizen" for the purpose of diversity jurisdiction. Roche, 175 Fed. Appx. at 601. Like Almond, the alter-ego inquiry in Roche was decided by the district court at summary judgment *after* developing a factual record. Id. at 599.

Here, the District Court failed to apply the appropriate burden of proof and require Appellees to produce facts supporting a claim of sovereign immunity. Instead the District Court refused to allow any discovery. In Gray v. Laws, this Court vacated the district court's sovereign immunity dismissal after noting "the

barrenness of the record[.]" <u>Gray</u>, 51 F.3d at 434. Like the court below, the district court in <u>Gray</u> entered judgment on the pleadings. <u>Gray</u>, 915 F. Supp. 747, 754 (E.D.N.C. 1994). This Court admonished the district court with instructions that "[g]enerally, the District Court is in the best position to address in the first instance the competing questions *of fact* and state law necessary to resolve the eleventh amendment issue[.]" <u>Gray</u>, 51 F.3d at 434 (quotations omitted and emphasis added) (quoting <u>Keller v. Prince George's County</u>, 827 F.2d 952, 964 (4th Cir. 1987)).

Similarly in <u>Blake v. Kline</u>, 612 F.2d 718 (3d Cir. 1979), <u>cert. denied</u>, 447 U.S. 921 (1980), the Third Circuit reversed a district court's determination that a statutorily-created public school employee retirement board was an alter-ego of the state. On appeal, plaintiff argued that the district court erred in relying solely on the statutory scheme which, at worst, was inconclusive. <u>Id</u>. at 721. The Third Circuit agreed noting that "[t]he defendant, in support of its motion to dismiss, relied exclusively on the various provisions of [the Code]." <u>Id</u>. The court vacated the judgment "[b]ecause we conclude the district court should have developed a record beyond the skeletal language of the Code[.]" <u>Id</u>.

Here, the District Court engaged in precisely the sort of cursory analysis that was grounds for reversal in <u>Gray</u> and <u>Blake</u>. In a footnote, the District Court noted

> Plaintiffs encourage the court to allow discovery regarding whether the Retirement Systems constitute an arm of the State. The need for such discovery is at the discretion of the district court. Oberg, 681 F.3d at 580 n.4. Upon review of the statutory scheme, the related portions of the South Carolina Constitution, and the relevant case law, the court finds that there is sufficient material evidence currently before the court to determine whether or not Retirement Systems is [sic] an arm of the State and, therefore, finds no need for discovery on this issue.

J.A. at 572 n.9. In doing so, dismissal was improvidently granted.

The District Court cited Regents of the University of California v. Doe, 519 U.S. at 431, for the proposition that "the proper inquiry is whether the state treasury is *potentially* liable for the judgment and not whether the state treasury will actually have to pay the judgment in a particular case." J.A. at 566 (emphasis original) (also citing Martin v. Clemson Univ., 654 F. Supp. 2d 410, 426 (D.S.C. 2009)). A proper reading of Regents and its progeny demonstrates its inapplicability here. In Regents, the Supreme Court considered whether the federal government's agreement to indemnify a state instrumentality for the cost of any adverse judgment divested the instrumentality of its Eleventh Amendment immunity. Regents, 519 U.S. at 426. The narrow question was whether an indemnification agreement modifies the sovereign immunity analysis. Id. at 426. In holding that it does not, the Court explained that

> it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant. Surely, if the sovereign State of California should buy insurance to protect itself against

> potential tort liability to pedestrians stumbling on the steps of the State Capitol, it would not cease to be "one of the United States."

Id. at 431. The District Court's emphasis on the opinion's use of the word "potentially" effectively reads that single word to the exclusion of all others. The proper inquiry is whether the state is legally responsible for the judgment, not whether the district court can imagine some circumstance whereby an appropriation might be made. As explained above, the State is not the indemnitor of the Retirement Systems and there is no alleged third-party indemnitor, as in Regents. Thus the District Court's reliance on Regents is misplaced.

## II. Working Retirees are entitled to prospective injunctive relief prohibiting the future seizure of their wages.

The District Court applied the incorrect test to determine whether Working Retirees stated a valid claim against the Trustees under the doctrine of Ex parte Young. Generally, sovereign immunity extends to state officials sued in their official capacity for money damages under the theory that the state remains the real party in interest. Edelman, 415 U.S. at 668. However, in Ex parte Young, the Supreme Court held that the Eleventh Amendment does not bar suit against a state official when the suit is for prospective injunctive relief from a continuing violation of federal law. Ex parte Young, 209 U.S. at 155–56. To determine whether the doctrine applies, "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks

relief properly characterized as prospective." <u>Verizon Md., Inc. v. Public Serv.</u> <u>Comm'n of Md.</u>, 535 U.S. 635, 645 (2002) (citations omitted); <u>see</u> J.A. 453 (citing <u>Verizon Md., Inc.</u>). Here, Working Retirees seek injunctive relief preventing the Trustees from further enforcement of South Carolina Code Sections 9-1-1790(C) and 9-11-90(4). J.A. at 31-33. To the extent that some of the Trustee board members are state officials serving *ex officio*, <u>Ex parte Young</u> authorizes suit and Working Retirees pled a cognizable claim against those officials. In concluding otherwise, the District Court mistakenly relied on an opinion reversed by the Supreme Court.

In its order of dismissal the District Court did not address the applicability (or inapplicability) of the <u>Ex parte Young</u> doctrine. In a footnote at the end of the opinion, the District Court dispensed with the issue by stating that "[b]ecause Plaintiffs seek monetary damages, the claims against the individual Defendants are also barred." J.A. at 584-85 n.14. Since this disposition was contrary to the relief sought, J.A. at 31-33, Working Retirees moved to alter or amend the judgment. Mot. Alter or Amend, D.Ct. Dkt. No. 45. That motion was denied. J.A. at 586-88. In its order denying the motion, the Court reasoned:

> Moreover, "just because a private citizen's federal suit seeks declaratory injunctive relief against State officials does not mean that it must automatically be allowed to proceed under an exception to the Eleventh Amendment protection." <u>Bell Atl. Md., Inc. v. MCI</u> <u>Worldcom, Inc.</u>, 240 F.3d 279, 294 (4th Cir. 2001). Instead, the court "must evaluate the degree to which a State's sovereign interest would

45

> be adversely affected by a federal suit seeking injunctive relief against State officials." Bragg v. W. Virginia Coal Ass'n, 248 F.3d 275, 293 (4th Cir. 2001).

J.A. at 587. Applying the reasoning of Bell Atlantic Maryland, Inc. and Bragg, the District Court concluded that the injunctive relief sought—return of Working Retirees wages and an injunction from future enforcement of Act 153's takings provision—is "undeniably monetary […] thereby implicating the immunity from suit provided for by the Eleventh Amendment." J.A. at 588. However, the District Court's reliance on Bell Atlantic and Bragg is mistaken as the rule set forth in those cases has been expressly overruled.

In Bell Atlantic Maryland, Inc. v. MCI Worldcom, Inc., 240 F.3d 279 (4th Cir. 2001), vacated sub nom. Verizon Maryland, Inc. v. Public Service Commission of Maryland, 535 U.S. 635, a telecommunications company sued a state public service commission and its commissioners seeking declaratory and injunctive relief from what it believed to be an erroneous interpretation and application of federal law. Id. at 285-86. The commission and commissioners asserted sovereign immunity and moved for dismissal. Id. at 286. A panel of this Court reasoned that in order to determine whether the doctrine of Ex parte Young permits suit against the commissioners the court must conduct an inquiry into whether allowing suit would "erode the important underlying doctrine of sovereign immunity." Id. at 294. The Bell Atlantic Court's analysis noted that the doctrine

46

was rejected in a case concerning a state's sovereign interest in its territorial land and waters and in a case where Congress had provided a detailed remedial scheme to enforce federal law. Id. at 295 (discussing Coeur d'Alene Tribe of Idaho, 521 U.S. 261 and Seminole Tribe of Fla., 517 U.S. 44). The Bell Atlantic Court concluded based on its reading of these cases that whether to apply the Ex parte Young doctrine required a case-by-case determination that "must evaluate the federal interests served by permitting a federal suit against [the commissioners], taking into account the remedial scheme for enforcement of federal law that Congress has established in the Telecommunications Act of 1996." Id. Bragg, decided the same year as Bell Atlantic, applied the same test. Bragg, 248 F.3d at 292-93.

On certiorari, Bell Atlantic was re-captioned as Verizon Maryland, 535 U.S. 635. The Supreme Court rejected the case-by-case, two-prong test and reversed, explaining that

> determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. [...] The prayer for injunctive relief-that state officials be restrained from enforcing an order in contravention of controlling federal law-clearly satisfies our straightforward inquiry.

Id. at 645 (internal quotations and citations omitted). The Court concluded "that the doctrine of Ex parte Young permits [the company's] suit to go forward against the state commissioners in their official capacities." Id. at 648.

Accordingly, the District Court mistakenly relied upon Bell Atlantic and Bragg and should have concluded that since Working Retirees' complaint meets this straightforward test, it is cognizable under the Ex parte Young doctrine and not barred by the Eleventh Amendment.

## III.    The Eleventh Amendment provides no immunity from suit for an unconstitutional taking of private property.

Even assuming the Retirement Systems are alter egos of the State, the Eleventh Amendment does not abridge an individual's right to seek relief from an unconstitutional seizure of private property for public purpose. While the Eleventh Amendment recognizes the residual sovereignty of the States, Alden, 527 U.S. at 715, this sovereign power is not without limit. So while the States generally need not answer in court for their legislative and executive enactments, the supremacy of the federal Constitution secures the rights of a free People by imposing specifically-enumerated limits on sovereign power. Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 714 (1931). Thus "[t]he limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise." Id. at 707. Implicit in the District Court's dismissal of Working Retirees' takings claim is the assumption that the Eleventh Amendment trumps the takings

clause as incorporated against the States through the Fourteenth Amendment. Such a holding cannot be correct as it would effectively deem the Bill of Rights meaningless as having been abrogated through the ratification of the Eleventh Amendment. If this Court finds it necessary to reach this issue it should hold that the Eleventh Amendment does not bar a takings claim. Constitutional claims to recover property from the government have never been barred by the sovereign immunity doctrine. Furthermore, a taking like the one enacted through Act 153 is always barred by the Fifth Amendment because it serves no public purpose.

### A.    Suits to recover property from the government have never been barred by sovereign immunity.

Sovereign immunity has never barred a citizen from suing to recover property illegally seized by the government. For example, in <u>United States v. Lee</u>, 106 U.S. 196 (1882), the Court considered whether sovereign immunity barred an action for ejectment where the government illegally occupied a landowners' property. Just like this case, the Court explained that the "defense stands here solely upon the absolute immunity from judicial inquiry" despite the fact that the government did not assert any legal authority for the seizure "or that the legislative body could give [the government] any such authority except upon payment of just compensation." <u>Id</u>. at 220-21. The Court explicitly rejected any notion that sovereign immunity barred the return of the landowners' property as inapposite to his right not to be deprived of property without the due process of law. <u>Id</u>

Significantly, the Court in Lee affirmed the circuit court's order for ejectment—injunctive relief for the return of the property—because even though the takings clause permits just compensation, its remedial power is not limited as such.

The Court reaffirmed an individual's constitutional right to seek the return of property in Larson v. Domestic & Foreign Corp., 337 U.S. 682 (1949). In Larson, the Court permitted suit against a government officer for the delivery of property that the plaintiff bought and paid for but was nevertheless sold to a third party by the government. Id. The Larson Court explained that what Lee permitted was not merely any claim challenging the government's legal authority to hold property, but "[o]nly where there is a claim that the holding constitutes an unconstitutional taking of property without just compensation does the Lee case require that conclusion." Id. at 697-99 (citing cases requiring the same); see also Malone v. Bowdoin, 369 U.S. 643, 646-48 (1962) (construing Lee and Larson as discussed).

This reasoning has applied equally in takings claims against states brought in federal court as evidenced by two cases of South Carolina origin. In Tindal v. Wesley, 167 U.S. 204 (1897), a citizen from New York purchased property from the State which was then seized by the South Carolina Secretary of State. Id. at 205-06. The plaintiff sued in federal court for ejectment and lost rent. Id. The court entered judgment for the plaintiff and ordered the federal marshal to take possession of the property and deliver it to the plaintiff. Id. at 206-07. On appeal,

the secretary took exception on grounds that the Eleventh Amendment barred federal relief.[14] Id. at 209-10. The Court rejected the sovereign immunity defense by quoting Lee's reasoning that the Fifth Amendment's protection of life, liberty, and property were too fundamental to our system of ordered liberty to require any specific grant of federal jurisdiction beyond the Constitution itself. Id. at 215 (quoting Lee, 106 U.S. at 218). In rejecting the sovereign immunity defense, the Court distinguished a takings case from a number of other cases where sovereign immunity *would* apply:

> The case here is not one in which judgment is asked against the defendants as officers of the state, nor one in which the plaintiff seeks to compel the specific performance by the state of any contract alleged to have been made by it, nor to enforce the discharge by the defendants of any specific duty enjoined by the state. […] It is a suit against individuals,-a case in which the plaintiff seeks merely the possession of certain real estate [….] The withholding of such possession by defendants is, consequently, a wrong, but a wrong which, according to the view of [the secretary's] counsel, cannot be remedied if the defendants choose to assert that the state, by them as its agents, is in rightful possession. The doors of the courts of justice are thus closed against one legally entitled to possession by the mere assertion of the defendants that they are entitled to possession for the state. *But the eleventh amendment gives no immunity to officers or*

---

[14] Notably, while appeal was pending, the state attorney general instigated a collateral proceeding in the name of the State attacking the Tindal judgment as barred by the Eleventh Amendment. South Carolina v. Wesley, 155 U.S. 542 (1895). In rejecting that argument, the Supreme Court noted that although the attorney general claimed the disputed property was state land used for public purposes, the state failed to intervene in the Tindal litigation to raise this argument even though nothing prevented it from doing so. See id. at 545. Likewise, here, the State's Attorney General never intervened on behalf of the State in furtherance of Appellees' sovereign immunity argument.

> *agents of a state in withholding the property of a citizen without authority of law*.

Id. at 221-22.

Likewise, in Hopkins v. Clemson Agr. College of S.C., 221 U.S. 636 (1911), a farmer sued Clemson College, a state-created corporation governed by a state-created board, after his farm was flooded by a dyke constructed by the college on public land at the State's behest. Id. at 641-42. The college obtained dismissal as an entity entitled to sovereign immunity but the Supreme Court reversed citing the farmer's Fourteenth Amendment right to be free from the deprivation of property without due process of law. Id. While acknowledging the general rule that a state and its officers are immune from suit for their torts, the Court cited the precedent of, *intra alia*, Lee, Tindal, and Ex parte Young reasoning that "if it appeared that they proceeded under an unconstitutional statute, their justification failed, and their claim of immunity disappeared on the production of the void statute." Id. at 644. The Court further noted that, like an officer, the college would likewise be immune from suit for a tort, but that the farmer's suit did not sound in tort. Id. at 646-47.

> But the plaintiff is not seeking here to hold the college liable for the nonfeasance or misfeasance either of its own officers or officers of the public. This is a suit against the college itself for its own corporate act in building a dyke, whereby the channel had been narrowed, the swift current had been diverted from the usual course across the plaintiff's farm, and, as it is alleged, destroying the banks, washing away the soil, and for all practical purposes as effectually depriving him of his property as if there had been a physical taking. […]

> Besides, we have no right to proceed on the theory that if, at the end of the litigation, plaintiff establishes his right to damages, the judgment would not be paid. These suggestions, though made in a plea to the jurisdiction, *afford no reason why the college should be granted immunity from suit, when it is claimed that, in violation of the Constitution, it has taken private property for its corporate purposes without compensation.*

Id. at 658-59 (emphasis added). Accordingly, if this Court concludes that the Retirement Systems, like the college, are arms of the State, Working Retirees' constitutional claims are still entitled to federal review just like the farmer's.

That this doctrine is well established is evidenced by the fact that takings cases continue to be heard in federal courts without any consideration of an Eleventh Amendment bar. For example, in Brown v. Legal Found. of Washington, 538 U.S. 216 (2003), escrow agents sued a state supreme court and a foundation challenging a state court rule requiring the deposit of client funds into an interest on lawyers' trust account (IOLTA) on the ground that their clients were not justly compensated and lost the beneficial use of their funds. Id. at 228-29. The district court reasoned that there was no taking, but even if there was a taking, the required just compensation was zero. Id. at 230-31. A three-judge panel of the Ninth Circuit disagreed, followed by *en banc* reversal. Id. While the Supreme Court affirmed, there was never any question that if the state rule constituted a taking and just compensation was not paid then the Court could enter a judgment for the return of the funds and enjoin the rule's further enforcement. While the majority and dissent

differed on whether there was a compensable loss, every member of the Court agreed that the claim was actionable as a taking. <u>Compare</u> <u>id</u>. at 240, <u>with</u> <u>id</u>. at 244 (Scalia, J., dissenting).

Similarly, sovereign immunity posed no bar to the Court's decision in <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003 (1992), as to whether a South Carolina act constituted a regulatory taking. In <u>Lucas</u>, a citizen seeking relief sued a statutorily-created council charged by the challenged act with regulatory permitting in coastal zones. <u>Id</u>. at 1007-08. Unlike this case, even though the state-created entity in <u>Lucas</u> was exercising the State's police power over a quintessential sovereign function—regulation of its territory—the Eleventh Amendment posed no bar to adjudicating the takings issue. <u>See</u> <u>id</u>. at 1009. As these cases assume, without discussion, that the Eleventh Amendment poses no bar to federal jurisdiction over a takings action, it should pose no bar here.

> **B.    Because Act 153 takes property for private, not public use, it is always barred by the Fifth and Fourteenth Amendments.**

Finally, while the issue presented for review is whether the Eleventh Amendment abrogates the takings clause against a state, any resolution of the takings claim on the merits must conclude that the public use clause will *always* bar the transfer of property enacted by Act 153.

> While it confirms the State's authority to confiscate private property, the text of the Fifth Amendment imposes two conditions on the

54

exercise of such authority: the taking must be for a "public use" and "just compensation" must be paid to the owner.

Brown, 538 U.S. at 231-32. "[I]t has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation." Kelo v. City of New London, Conn., 545 U.S. 469, 477 (2005). Government redistributions of property from one private party to another are always *ultra vires* acts deemed void. Id. at 477; see also Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void"); Missouri Pacific R. Co. v. Nebraska, 164 U.S. 403 (1896).

As explained above, Act 153 seizes Working Retirees' wages for the benefit of other Retirement Systems' participants. To the extent Appellees contend additional revenue is needed to fund the Retirement Systems, taking earnings from Working Retirees merely forces them to subsidize the cost of someone else's retirement. This is precisely the sort of gross injustice that the public use and just compensation clauses are designed to prevent. In her powerful Kelo dissent, Justice O'Connor discussed the public use and just compensation clauses, explaining:

> These two limitations serve to protect "the security of Property," which Alexander Hamilton described to the Philadelphia Convention as one of the "great obj[ects] of Gov[ernment]." 1 Records of the Federal Convention of 1787, p. 302 (M. Farrand ed. 1911). Together they ensure stable property ownership by providing safeguards against

excessive, unpredictable, or unfair use of the government's eminent domain power—particularly against those owners who, for whatever reasons, may be unable to protect themselves in the political process against the majority's will.

<u>Kelo</u>, 545 U.S. at 496 (O'Conner, J., dissenting). Accordingly, were this Court to reach the merits of the takings issue, Working Retirees respectfully submit the Court should conclude that Act 153's takings provision serves no public use. There being no public use, this is not a compensable taking and thus the sole remedy available is the return of Working Retirees' earnings.

## **<u>CONCLUSION</u>**

For these reasons, Appellants respectfully submit that the opinion of the District Court should be reversed.

Respectfully submitted by:

s/Richard A. Harpootlian
RICHARD A. HARPOOTLIAN, P.A.
Richard A. Harpootlian (Fed. ID # 1730)
rah@harpootlianlaw.com
Graham L. Newman (Fed. ID # 9746)
gln@harpootlianlaw.com
Christopher P. Kenney (Fed. ID # 11314)
cpk@harpootlianlaw.com
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

LEWIS BABCOCK & GRIFFIN, LLP
James M Griffin (Fed. ID #1053)
jmg@lbglegal.com
Margaret N. Fox (Fed ID #10576)
mnf@ lbglegal.com
LEWIS BABCOCK & GRIFFIN, LLP
Post Office Box 11208
Columbia, SC 29211
Telephone: (803) 771-8000
Facsimile: (803) 733-3534

*COUNSEL FOR APPELLANTS*

Columbia, South Carolina
June 3, 2013

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains <u>13,957</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

<u>/s/ Richard A. Harpootlian</u>
Richard A. Harpootlian

Dated:  June 3, 2013

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on June 3, 2013, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF System, which will send notice of such filing

to the following registered CM/ECF users:

> Robert E. Stepp
> Tina M. Cundari
> SOWELL, GRAY, STEPP, & LAFFITTE, LLC
> 1310 Gadsden Street
> P. O. Box 11449
> Columbia, SC  29211-1550

> *Counsel for Appellees*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

> /s/  Shelly N. Gannon
> Shelly N. Gannon
> GIBSON MOORE APPELLATE SERVICES, LLC
> 421 East Franklin Street, Suite 230
> Richmond, VA  23219